## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

YONA OPENDEN, *et al.*,

    *Plaintiffs*,

  v.

ROBERT KENNEDY, JR.,

    *Defendant*

Case No. 25-cv-1720-ABA

### MEMORANDUM OPINION

In June 2024, the Centers for Medicare and Medicaid Services (CMS) distributed a video internally to its employees as part of a "Coffee With" series. The June 2024 episode was an interview with Ronza Othman, the director of the EEO Compliance Group within CMS's Office of Equal Opportunity and Civil Rights. In the video, Ms. Othman, who is an attorney who happens to be blind and was holding a white cane, describes her hobbies, the challenges and opportunities of serving in a role like hers, and other aspects of her approach to her job.

Plaintiffs in this case worked for CMS at the time and are Jewish. They have sued the Secretary of the U.S. Department of Health and Human Services in his official capacity ("Defendant" or "HHS"), contending that the video constituted "severe, pervasive, and unwelcome harassment" on the basis of national origin and religion. ECF No. 1 ¶ 35.[1] They do not take issue with the content of the interview but rather with a scarf that Ms. Othman was wearing during the interview that both Plaintiffs and Ms. Othman have described a keffiyeh. Plaintiffs do not take issue with Ms. Othman wearing a keffiyeh as such, but rather focus on an image on it that includes a Palestinian flag, a

---

[1] Page citations correspond to the ECF page numbers, which may differ from the pagination used by the parties.

map, and a hand with two fingers raised. Plaintiffs contend that they perceive the image as "advocating for the murder and slaughter of persons of Jewish heritage and faith, as well as the destruction of Israel." *Id.* ¶ 34.

HHS vigorously disputes that characterization, or the reasonableness of that perception. But for current purposes the Court need not wade into those disputes because for Plaintiffs' hostile work environment claim to proceed, they must allege either (1) that Ms. Othman was Plaintiffs' "supervisor" or (2) that after being put on notice of the allegedly harassing behavior HHS took "'*no* prompt and adequate remedial action to correct it.'" *EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (quoting *Mikels v. City of Durham*, 183 F.3d 323, 329 (4th Cir. 1999)). Plaintiffs' allegations do not allege facts that would satisfy either standard.[2]

## I.    BACKGROUND

Because the case is at the pleading stage, the Court accepts as true Plaintiffs' allegations and draws all reasonable inferences from those allegations in their favor. *See Episcopal Church in S.C. v. Church Ins. Co. of Vt.,* 997 F.3d 149, 154–55 (4th Cir. 2021). Plaintiffs allege as follows.[3]

---

[2] Defendant also asserts that at minimum Plaintiffs' claim based on religious-based discrimination should be dismissed because "Plaintiffs have set forth no facts that would support the conclusion that the alleged harassment occurred because of their religion." ECF No. 12-1 at 10. The Court need not and does not reach that argument for partial dismissal because, for the reasons explained herein, the complaint is subject to dismissal on other grounds. As explained below, the Court also need not and does not reach the question of whether the conduct alleged rises to the level of "severe or pervasive" as required to make out a hostile work environment claim.

[3] HHS has styled its motion as one "to dismiss or for summary judgment." ECF No. 12. In certain circumstances it is proper for a court to consider a motion for summary judgment even before discovery has commenced. *See, e.g.*, *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) ("It is well settled that district courts may convert a Rule

Plaintiffs each were working for CMS when, on or about June 3, 2024, CMS "distributed a video to its employees, including the Plaintiffs, featuring management official Ronza Othman, Director, EEO Compliance Group, Office of Equal Opportunity and Civil Rights." ECF No. 1 ¶ 9. The video, which is in the record and is referred to and thereby incorporated into the complaint, *see id.* ¶¶ 9–11 & ECF No. 17, is four minutes long. The interview was, as Plaintiffs put it, part of the "June edition of the CMS Pulse" and "included an episode of 'Coffee With' with Ronza Othman, Director of EEO Compliance Group at CMS." ECF No. 12-3 at 1. A recorded version of the interview was filed at the Court's direction, ECF Nos. 16 & 17, and Plaintiffs do not dispute the authenticity of that recording. The interview proceeded in its entirety as follows:

> *Interviewer (Reagan Warfield)*: Hi, and welcome to "Coffee With." Today, we're talking with Ronza Othman, Director of the Equal Employment Opportunity Compliance Group. Thank you for joining us.
>
> *Ronza Othman*: Happy to be here.
>
> *Warfield*: For starters, what's your super power?
>
> *Othman*: I would say it is taking chaos, in terms of logistics, and making it make sense, using primarily Microsoft Excel, but I love logistics, and I love making things organized that originally were not organized.

---

12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment, allowing them to assess whether genuine issues of material fact do indeed exist."). Here, the Court need not consider HHS's summary judgment motion because even accepting Plaintiffs' allegations as true, the complaint does not state a cognizable hostile work environment claim. Insofar as the Court refers herein to documents attached to HHS's motion, it does so either (1) because the documents were referred to or otherwise incorporated into Plaintiffs' complaint, *see, e.g.*, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016), or (2) in one instance below, although not material to the analysis, to observe that Plaintiffs and Ms. Othman concur in considering the scarf she was wearing to be a keffiyeh.

*Warfield*: Is that a big part of what you do as the Director?

*Othman*: Absolutely.

*Warfield*: How so?

*Othman*: Well, I supervise attorneys primarily. We are trying to meet regulatory deadlines every day. We are trying to respond to what judges are telling us they want and need, and so a big chunk of my job is to try to make it more organized while maintaining the human factor, because of course, in the line of work I'm in, employment discrimination and civil rights, you're dealing with folks and their emotions. What they're trying to, what they're experiencing is often the hardest day of their career, sometimes of their entire life, and so, bringing organization to chaos while maintaining the humanity piece.

*Warfield*: With, with your job, what is your absolute favorite thing to do?

*Othman*: My absolute favorite thing to do is to meet with people, who, as I said, are struggling, are having possibly the worst day of their career. Employment law is essentially the corporate version of divorce law, if you can imagine. And then helping them to understand that tomorrow absolutely will be better from a psychosocial perspective.

*Warfield*: How do you get your mind off of work? What do you do?

*Othman*: I read trashy romance novels.

*Warfield*: Can you name, can you name any?

*Othman*: So, you know, Nora Roberts–

*Warfield*: That's not trashy!

*Othman*: Well, OK, so I used to read the "Harlequin Romance" novels, but now, I've leveled up, and so now I'm reading better quality romance novels–

*Warfield*: Less trashy.

*Othman*: Less trashy, exactly. Susan Mallery, you know, that sort of genre. I like knowing that I'm going to pick up a book and it's going to have a "happily ever after" at the end. That, really, that escapism is important to me, because, as I said, the emotion that comes from working in this line of

work every day, it can take a toll. I also love to travel. And in my spare time, I manage a nonprofit as a volunteer, the National Federation of the Blind of Maryland, where I work alongside the other volunteers to ensure equal access to information, civil rights, advocacy services, and education supports for Marylanders who are blind or low vision.

*Warfield*: With everything that you've accomplished–I know you've testified in front of Senate committees, I know that you are running a nonprofit–is there an accomplishment so far that really stands out above everything else?

*Othman*: I think the biggest accomplishment, the one that I'm most proud of, is the very first time that I picked up my long, white cane, and I went on an international trip by myself, because I am myself blind. I have very little functional vision. So, the first time I picked up my cane and I went, actually, to the UK, and I did it pretty much by myself. I had a friend who was with me, but we agreed she wasn't going to be a guide or anything. She was just going to be there to have fun. That was probably the biggest accomplishment because that pushed me out of my own comfort zone in a way that I really needed. It built confidence in myself in other areas of my life, including in my work. And I also learned that so much of the world's information is visual, and most people take that for granted. I don't have that luxury, and so I need to ask more questions. I can't read a street sign, for example. I can't read the name of a business on its lintel. I need to ask somebody, "What is this?" and even if they look at me funny, or even if they don't understand that this cane means I can't actually read that for myself, that doesn't mean that my brain doesn't work. It just means my eyes don't work. And so that trip and my life experiences really solidified that for me, and that's the message that I want to get out to everybody else in the world. That's why I do the nonprofit work I do.

*Warfield*: Incredible. Ronza, pleasure talking to you. Thank you so much for sharing your story with us and joining us here on "Coffee With."

*Othman*: Thank you. It's been great.

During the interview, as noted above, Ms. Othman was holding a white cane and was wearing a scarf. Although the scarf she was wearing is not a traditional (square, knotted or fringed) keffiyeh—it appears to be a long, narrow silk scarf—Plaintiffs (and Ms. Othman) describe it as a keffiyeh or, as Plaintiffs put it in an "open letter" to CMS

management, "a scarf bearing the pattern of a keffiyeh." ECF No. 1 ¶¶ 10–11; ECF No.

12-2 at 11 (internal CMS investigation report describing an interview with Ms. Othman,

in which she, like Plaintiffs in their complaint, considered it a keffiyeh); ECF No. 12-3 at

1 (open letter to management). Whether it was a "keffiyeh"—and what symbolism a

keffiyeh may be intended to convey or be perceived as conveying—is immaterial here,

however, because Plaintiffs do not contend that Ms. Othman wearing a keffiyeh would

have rendered the video offensive. Instead, Plaintiffs' claim hinges on an image

appearing at the two ends of the scarf. ECF No. 1 ¶ 10 ("During the video, Ms. Othman

was wearing a keffiyeh which displayed a symbol of violence against Jewish persons.").

It is that image that Plaintiffs claim rendered the interview "severe, pervasive, and

unwelcome harassment." *Id.* ¶ 35.

Screenshots of the interview that show the image on the scarf are in the record at

ECF No 12-2 at 6–7. The image appears to be of a Palestinian flag, a map of

Israel/Palestine (*i.e.*, of Israel including the Palestinian territories), and a hand in front

with the flag with two fingers raised. The hand is colored red. The parties vigorously

dispute the significance of the hand: Ms. Othman stated that she understood the image

to be "a peace sign" and stated that when she purchased it "[t]he shop carried keffiyeh

with peace signs in various colors." *Id.* at 11. Plaintiffs, on the other hand, allege that

they perceived it as "a symbol of red hand, which advocates for violence, including

murder, against Jewish persons and the denial of the right of Israel to exist." ECF No. 1

¶ 11. They allege that a red hand with two fingers raised is not a peace sign but rather

"glorifies the murder of Jewish persons for their national origin and religion." *Id.* ¶ 12.

On June 6, three days after the date that Plaintiffs allege the video was disseminated, *see id.* ¶ 9,[4] Plaintiffs along with other CMS employees circulated an open letter to CMS management. The letter described Ms. Othman as "wearing a scarf bearing the pattern of a keffiyeh depicting a Palestinian flag over the shape of the map of Israel and a red hand that has become symbolically associated with gruesome acts of violence and bloodshed." ECF No. 12-3 at 1. The letter went on to acknowledge that CMS policy "is broader than the legal definition of harassment" and prohibits "any comment or conduct that disparages, denigrates, or demonstrates hostility or aversion towards any person (including applicants for employment) that could reasonably be interpreted as harassing, offensive, or inappropriate in the workplace," including through "dissemination of offensive written or pictorial material." *Id.* (quoting CMS Policy Statement on the Prevention of Harassing, Offensive and Inappropriate Conduct, emphases omitted). Plaintiffs described Ms. Othman's "choice of attire" as "deeply disturbing, offensive, and appalling" particularly because she was appearing in an official CMS video "while serving in her official capacity as the Director of the EEO Compliance Group." *Id.* They also stated that they considered her "choice of attire" as "deter[ring] those who are offended by her actions from safely seeking EEO guidance and counseling." *Id.*

In that letter, Plaintiffs acknowledged, "We have recently been informed that the video has been removed, and we appreciate leadership's prompt action." *Id.* at 2. They stated, however, that they "strongly feel that accountability requires that additional

---

[4] In some places in the record the video is described as having been disseminated on May 31. The precise date (May 31 or June 3) is immaterial, but for present purposes the Court relies on the date alleged in Plaintiffs' complaint (at ¶ 9).

action be taken," to "ensure that CMS continues to be a place where all employees feel safe and respected, especially by those whose job it is precisely to do so in the first place." *Id.*

Between August 16 and December 19, 2024, Plaintiffs filed formal charges of discrimination. ECF Nos. 12-2 & 12-4. Despite the agency having removed the video within a day or two of Plaintiffs having brought their concerns to the agency's attention—the "leadership's prompt action" described in their June 6 letter—and although Plaintiffs do not identify concerns about any incidents since the dissemination of the "Coffee With" interview, Plaintiffs considered additional action to be called for but that from their perspective "[t]he instant matters remain unresolved." ECF No. 1 ¶ 31. Specifically, they complain that "no recourse was taken by the Defendant against Ms. Othman" and the agency also "refused to apologize." *Id.* ¶ 15–17.

Accordingly, on May 30, 2025, they filed this lawsuit. Their complaint contains a single count, entitled "National Origin and Religion Harassment," asserted under Title VII of the Civil Rights Act of 1964. ECF No. 1 ¶¶ 32–38. As for Plaintiffs' claim of a hostile work environment based on religious discrimination, although the complaint does not expressly allege that each Plaintiff is Jewish, drawing all reasonable inferences in Plaintiffs' favor, the Court presumes that is what Plaintiffs intended through allegations such as paragraphs 10 through 13, and that is what Plaintiffs alleged in their formal administrative complaints of discrimination. ECF No. 12-4 at 2, 9, 20, 22, 27, 32, 34, 36. As for Plaintiffs' claim of a hostile work environment based on national-origin discrimination, the complaint does not allege any Plaintiff's national origin. Three plaintiffs included in their administrative complaint (a) a claim that they were discriminated against on the basis of national origin and (b) identified their country of

origin. ECF No. 12-2 at 2 (Openden, Israeli); ECF No. 12-4 at 34 (Marciano, Israeli American) & 36 (K. Klein, Israel). Although the complaint in this Court, on its face, does not allege facts of national-origin discrimination (given the absence of any allegation of any Plaintiff's country of origin), the Court will assume without deciding that, as to those three Plaintiffs, they have asserted a hostile work environment claim based on national-origin discrimination.[5]

HHS filed a motion to dismiss or in the alternative for summary judgment. ECF No. 12. Plaintiffs filed a response brief in opposition and HHS filed a reply brief. ECF Nos. 13 & 15. Because the video in question was integral to the complaint and accordingly may be considered at the pleading stage, the Court directed the parties to file the interview video, ECF No. 16, which HHS did on May 28, 2026. ECF No. 17.

## II.   STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails to "state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R.

---

[5] In seven of Plaintiffs' internal charges of discrimination they also characterized their claim as discriminatory based on race. ECF No. 12-2 at 2 (Openden); ECF No. 12-4 at 4 (Weiss); *id.* at 8 (Shiman); *id.* at 27 (E. Klein); *id.* at 32 (Schnur); *id.* at 33 (Marciano); *id.* at 35 (K. Klein). In their complaint in this Court, Plaintiffs do not contend that dissemination of the video was discriminatory based on race. ECF No. 1 ¶ 33 (asserting a hostile work environment claim based on national origin and religion). Also, two plaintiffs filled out the box for "national origin" on the administrative charge form, identifying "Jewish" as their "national origin." ECF No. 12-4 at 3 & 32. But Judaism is a religion, not a country, and so the Court construes those charges of discrimination to have asserted a hostile work environment claim based on religious discrimination, not national-origin discrimination.

Civ. P. 12(b)(6). To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The pleadings must contain sufficient factual allegations to state a facially plausible claim for relief. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). When considering such a motion, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

HHS's motion is styled as both for dismissal under Federal Rule 12(b)(6), and for summary judgment under Rule 56. As noted above, the Court need not consider HHS's summary judgment motion because even accepting Plaintiffs' allegations as true the complaint does not state a cognizable hostile work environment claim. *See* n.3, *supra.*

## III.   DISCUSSION

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" 42 U.S.C. § 2000e–2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. Cent. Wholesalers, Inc.,* 573 F.3d 167, 174 (4th Cir. 2009) (quoting *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001)). To state a claim for a "hostile work environment" under Title VII, a plaintiff must allege facts that, if true, establish that (1) the plaintiff was subjected to "unwelcome conduct," (2) the conduct

10

was "based on the plaintiff's [protected characteristic, here religion or national origin]," (3) the conduct was "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment," and (4) the conduct is "imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (*quoting Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)); *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (applying the same elements to hostile work environment claims based on, among other things, national origin). The Court begins with the fourth element, because that analysis is dispositive of HHS's motion to dismiss.[6]

### A.    Imputation

"[T]he existence of unwelcome conduct, based on an employee's race or sex [or religion or national origin], that is severe or pervasive enough to create a hostile work environment, is not on its own enough to hold an employer liable." *Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020). To sue an employer for a hostile work environment, an indispensable element is that the conduct at issue is "imputable to the

---

[6] The Court will assume—without deciding—that Plaintiffs have adequately satisfied the second element (as to all Plaintiffs based on religion, and as to Plaintiffs Openden, Marciano, and K. Klein based on national origin). As for the first element, the Fourth Circuit has stated (at least in dicta) that "[c]onduct is 'unwelcome' when it continues after the employee sufficiently communicates that it is unwelcome." *Roberts v. Glenn Indus. Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021) (citations omitted). Here, Plaintiffs acknowledge that the video was removed immediately when they brought their concerns about Ms. Othman's scarf to management's attention. But HHS has not moved to dismiss on that basis, and the Court need not decide whether that element would be satisfied (or whether or when a prior communication that conduct is unwelcome is necessary to satisfy that element, or whether some conduct is so clearly unwelcome that no such communication or notice is required). Instead, the Court assumes without deciding that Plaintiffs have adequately satisfied the "unwelcome conduct" element too.

employer." *Boyer-Liberto*, 786 F.3d at 271. The specific standards for that element depend in part on "the status of the alleged harasser," *Bazemore*, 957 F.3d at 201, *i.e.*, whether or not the alleged harasser was a "supervisor" for imputation purposes, a term that has been defined narrowly in the caselaw. Where an alleged harasser was a "supervisor," the employer "may be *vicariously* liable for its employees' creation of a hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 428 (2013). Where the harasser was not a supervisor, a different standard applies, and focuses instead on whether the employer had "actual or constructive knowledge of the allegedly harassing conduct," and took "'*no* prompt and adequate remedial action to correct it.'" *Xerxes*, 639 F.3d at669 (*quoting Mikels*, 183 F.3d at 329.

Here, Plaintiffs contend that their allegations satisfy both standards. The Court concludes that they have satisfied neither.

### i. Ms. Othman was not Plaintiffs' "supervisor" for purposes of a hostile work environment claim.

"In *Vance* [*v. Ball State Univ.*, 570 U.S. 421 (2013)], the Supreme Court resolved a circuit split and defined 'supervisor' for purposes of imputed liability under Title VII." *Strothers v. City of Laurel,* 895 F.3d 317, 333 (4th Cir. 2018). It held that a supervisor is an individual who has been empowered "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance*, 570 U.S. at 431. In adopting that standard, the Supreme Court expressly rejected a competing theory, which had been adopted by some circuits, that "tie[d] supervisor status to the ability to exercise significant direction over another's daily work." *Id.*

Plaintiffs do not allege that Ms. Othman had any authority "to take tangible employment actions against [them]," as required by *Vance*. Plaintiffs themselves allege that Ms. Othman was an official in the Office of Equal Opportunity and Civil Rights, ECF No. 1 ¶ 9, and none of them allege that they worked in that office or otherwise reported to Ms. Othman. In their response to HHS's motion to dismiss, Plaintiffs contend that their allegations are sufficient to qualify Ms. Othman as a "supervisor" under *Vance*, at least at the pleadings stage. Relying on paragraph 9 of the complaint, they argue that "[i]t can be reasonably inferred, and indeed is even admitted by the Defendant, that the Defendant's EEO office responsible for the EEO activities taken by the Defendant, including investigating and making determinations about violations of the Defendant's EEO policies," including "recommendations about potential disciplinary action to resolve potential violations." ECF No. 13 at 7. Plaintiffs further contend, "[i]t does not matter that Ms. Othman could not directly fire, hire, or otherwise take discipline against them—determinations of the office she led could have direct impact on the Plaintiffs' employment status, possibly even leading to termination, with the Defendant." *Id.*

Those factual allegations in Plaintiffs' response brief may be true (and the Court assumes they are) and the inferences they ask the Court to draw may be reasonable. For example, it does appear reasonable to infer that a person in a position of authority within an agency-wide EEO office, like Ms. Othman, can exercise some authority over the terms of employment of individuals outside her specific office, including, as Plaintiffs articulate, by "investigating and making determinations about violations of the Defendant's EEO policies" and making "recommendations about potential disciplinary action to resolve potential violations." *Id.* And for that reason it may be reasonable for

Plaintiffs to expect that a person in Ms. Othman's position would err on the side of caution in avoiding statements or conduct within the workplace that risk offending others, whether intended as such or not. But even considering those facts and inferences (*i.e.*, even though courts do not permit plaintiffs to amend complaints through briefs in oppositions to a motion to dismiss, *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)), none of them render her Plaintiffs' "supervisor" under the narrow standard set forth in *Vance*. In *Vance*, the Supreme Court took pains to emphasize "a clear distinction between supervisors and co-workers," one that "can usually be readily determined, generally by written documentation." 570 U.S. at 432. The *Vance* Court expressly rejected a standard that "would make the determination of supervisor status depend on highly case-specific evaluation of numerous factors." *Id*. Here, Plaintiffs' acknowledgement that "Ms. Othman could not directly fire, hire, or otherwise take discipline against them," ECF No. 13 at 7, is dispositive under *Vance*.

For these reasons, for purposes of imputing Ms. Othman's conduct to the agency itself, Plaintiffs' complaint does not trigger imputation based on a supervisor theory.

### ii. The complaint does not state a claim based on a non-supervisor theory either.

Because Ms. Othman was not Plaintiffs' "supervisor" within the meaning of *Vance*, to state a hostile work environment against HHS Plaintiffs must allege that the agency (1) "knew or should have known about the harassment" and (2) upon such notice failed to take "remedial action reasonably calculated to end the harassment." *Xerxes*, 639 F.3d at 669 (quoting *Ocheltree v. Scollon Prods. Inc.,* 335 F.3d 325, 333–34 (4th Cir. 2003) (en banc) for the first point, and *EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306,

319 (4th Cir. 2008) for the second point). "'The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination.'" *Id.* (quoting *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 187(4th Cir. 2001)). "'However, the mere promulgation of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably.'" *Id.* (quoting *Spriggs,* 242 F.3d at 187).

Here, Plaintiffs do not allege facts that would trigger liability under this alternative imputation theory. Plaintiffs allege that the video at issue was disseminated on or about June 3, 2024. ECF No. 1 ¶ 9. Their open letter to CMS management is dated June 6. *Id.* ¶ 14; ECF No. 12-3. Plaintiffs concluded that letter as follows:

> We have recently been informed that the video has been removed, and we appreciate leadership's prompt action. However, we strongly feel that accountability requires that additional action be taken. Our agency must set an example of leadership and accountability. We bring this matter to your attention in the hope that you take immediate steps to ensure that CMS continues to be a place where all employees feel safe and respected, especially by those whose job it is precisely to do so in the first place.

ECF No. 12-3 at 2.

In deciding whether an employer, upon being put on notice of alleged harassment, took "remedial action reasonably calculated to end the harassment," *Xerxes*, 639 F.3d at 669, a court must "consider[] the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually

effective." *Id.* Here, on the face of the complaint itself (along with the open letter, which is incorporated therein by reference, ECF No. 1 ¶ 14), Plaintiffs acknowledged that the video was removed within days of being posted, and expressed their appreciation for "leadership's prompt action." ECF No. 12-3 at 2. Moreover, whether harassment recurs is relevant to whether an employer's response to a complaint of harassment was reasonably calculated to end the harassment. *See Bazemore*, 957 F.3d at 202 ("Bazemore's complaint makes clear that in response to her complaints, Best Buy took steps that were not only reasonably calculated to end Creel's behavior, but that did, in fact, end it."). Even when harassment does recur, "either by the same offender or different offenders," that "does not, *ipso facto,*" establish that "an employer's response was not reasonably calculated to end the harassment." *Xerxes*, 639 F.3d at 669 (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 676 (10th Cir. 1998)). Harassment is not necessarily imputed to an employer simply because remedial action turns out to have been "'ineffective in stopping the harassment.'" *Id.* at 670 (quoting *Knabe v. Boury Corp.,* 114 F.3d 407, 411–12 n.8 (3d Cir. 1997)). But here, Plaintiffs do not contend that anything like Ms. Othman's display of the complained-of image happened again; there is no allegation that the alleged harassment recurred. The absence of any recurrence, combined with the fact that the employer immediately (within a day or two) removed the allegedly offending video, further confirm that Plaintiffs have not alleged facts that would establish that HHS, once it knew or should have known about the harassment, failed to take remedial action reasonably calculated to end the harassment.

Plaintiffs contend that the agency's response fell short because "no recourse was taken by the Defendant against Ms. Othman" and the agency "refused to apologize" and instead "continued" (at least for an unspecified period of time) "to defend the actions of

16

Ms. Othman." ECF No. 1 ¶¶ 15, 17. But "an employer is not required to terminate a [particular] perpetrator except where termination is the only response that would be reasonably calculated to end the harassment." Xerxes, 639 F.3d at 670 (quoting *Adler*, 144 F.3d at 676–77). Here, Plaintiffs have not alleged facts that would establish that taking "recourse" against Ms. Othman personally was the "only response that would be reasonably calculated to end the harassment." *See id.*; *see also Bazemore*, 957 F.3d at 201 ("Title VII does not prescribe specific action for an employer to take in response to racial or sexual harassment, or require that the harasser be fired, as Bazemore suggests should have happened to Creel.").

For these reasons, even accepting all of Plaintiffs' factual allegations as true and drawing all reasonable inferences in their favor, Plaintiffs have failed to allege facts that satisfy the imputation element of a Title VII hostile work environment claim.

### B.   Severity/Pervasiveness

To satisfy the second element of a hostile work environment claim, a plaintiff must plead (and eventually prove) that "harassment was severe or pervasive," meaning that he or she "perceived, and a reasonable person would perceive, the work environment to be abusive." *Amirmokri v. Balt. Gas and Elec. Co.*, 60 F.3d 1126, 130–31 (4th Cir. 1995) (quoting *Beardsley v. Webb,* 30 F.3d 524, 530 (4th Cir. 1994); citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). That generally requires the work environment to have been "permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotation marks omitted).  "Whether the environment is objectively hostile or abusive is 'judged from the perspective of a

reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs.*, Inc., 523 U.S. 75, 81 (1998))  "Courts determine 'whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006) (*quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)); *Goffe v. Johns Hopkins Health Sys. Corp.*, Case No. 25-cv-695-GLR, 2015 WL 3489893, at *3 (D. Md. June 2, 2015)) (internal quotation marks omitted). For cases arising from a single instance of harassment as opposed to a sustained pattern of conduct the conduct generally must be "extremely serious" to qualify. *Boyer-Liberto*, 786 F.3d at 277 (quoting *Faragher*, 524 U.S. at 788).

HHS argues that Plaintiffs' allegations do not satisfy this "severe or pervasive" element for two reasons. First, the agency argues, "the alleged 'symbol of violence' on Ms. Othman's scarf is, at best, ambiguous" and lacks a "widely held societal meaning" in contrast to "widely recognizable symbols of racial violence, such as swastikas or nooses." ECF No. 12-1 at 15; *see also id.* ("While Plaintiffs assert that the red hand 'advocates for violence, including murder, against Jewish persons and the denial of the right of Israel to exist,' they cite no evidence to support this claim."). Second, HHS argues that, in any event, "Plaintiffs cannot establish that their exposure to these images in a nonmandatory video by persons who were not in a supervisory role to them, constitutes a hostile work environment." *Id.* at 16. In that regard HHS points out that the Fourth Circuit has repeatedly held that conduct more egregious than Ms. Othman's did not rise to the level of severity or pervasiveness required to make out a Title VII hostile work

18

environment claim. *Id.* at 17–18 (citing *McIver v. Bridgestone Americas, Inc.,* 42 F.4th 398, 408 (4th Cir. 2022) and *Skipper v. Giant Food Inc.,* 68 F. App'x 393, 399 (4th Cir. 2003)). HHS further argues that severity/pervasiveness is further lessened because "[t]here is no allegation that Plaintiffs were subjected to the images as a permanent display in their workplace, that Plaintiffs were required to view the images or that the images were specifically targeted to Plaintiffs in any way" and "do not indicate that they worked for or with Ms. Othman or that there was any reason for her to know them or their religious beliefs." *Id.* at 18.

Plaintiffs respond that regardless of what Ms. Othman understood the image of her scarf to mean, and regardless of what other people who may have viewed the image to mean, *their* belief is that "the symbol outright stood for the denial of the right of the State of Israel to exist" and effectively is a "call[] for no less than genocide of Jewish persons and the Jewish state." ECF No. 13 at 5. They further contend that the conduct rose to the level of "alter[ing] the conditions of their employment to degree that it created a hostile work environment" because Ms. Othman "was responsible for the department of the Defendant that was tasked with preventing and remedying the conduct alleged by the Plaintiffs" and "[y]et she was the one committing the atrocious hate speech." *Id.* at 6.

At this stage, because the complaint is being dismissed (without prejudice, as discussed below), the Court need not and does not decide whether Plaintiffs' allegations sufficiently allege conduct that would satisfy the "severe or pervasive" element for a hostile work environment claim.

19

### C.      Dismissal without prejudice

Where, as here, a court dismisses a complaint at the pleading stage for failure to state a claim on which relief can be granted, the next question becomes whether dismissal should be with prejudice or without. Because this is Plaintiffs' first complaint, the Court will dismiss the complaint without prejudice. *See GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 176 (4th Cir. 2007). If Plaintiffs believe they can allege facts triggering imputation, and facts satisfying the "severe or pervasive" element, they may file a motion to reopen the case and for leave to file an amended complaint within thirty days.

## IV.    CONCLUSION

For these reasons, Plaintiffs have not stated a claim for harassment under Title VII on which relief can be granted, and accordingly the complaint is dismissed, without prejudice. To be sure, Plaintiffs make an eminently valid point that a person in Ms. Othman's position, who as an equal employment officer must remain neutral when processing complaints (as she acknowledged to the EEO counselor, ECF No. 12-2 at 12), is arguably held to a higher standard of impartiality than other coworkers. But for the reasons stated above, under the caselaw Plaintiffs' complaint is subject to dismissal for failure to state a claim.

A separate order follows.


Date:  June 30, 2026                                   _____/s/_____
                                                                    Adam B. Abelson
                                                                    United States District Judge